UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MICHAEL J. LORENZO,

        Plaintiff,

v.                                                                            Case No. 5:06-cv-24-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.
_____

### REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits. (Doc. 1.) The Commissioner has answered (Doc. 18) and both parties have filed briefs outlining their respective positions. (Docs. 21 & 22.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED.**

### I. PROCEDURAL HISTORY

On June 21, 2000, Plaintiff protectively filed an application for disability insurance benefits claiming a disability onset date of March 1, 2000. (R. 49.) The protective application was initially processed by the Commissioner on July 14, 2000 and signed by Plaintiff on August 15, 2000. (R. 51-54.) The application was denied initially on April 3, 2002 and on reconsideration on August 29, 2002. Plaintiff filed a request for hearing before an administrative law judge ("ALJ") and on July 21, 2004 an administrative

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

hearing was held before an ALJ. On November 24, 2004, the ALJ issued his decision finding Plaintiff not disabled. (R. 457-465). On November 22, 2005, the Appeals Council denied Plaintiff's request for review. (R. 6-9.) On January 19, 2006, Plaintiff filed suit in this Court seeking judicial review of the Commissioner's decision. (Doc. 1.)

## II. **STANDARD OF REVIEW**

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[2] See 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[6] The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[12] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[18] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

---

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[16] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (*internal citations omitted*).

[17] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

[18] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[19] Walker at 1003.

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[21] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[22]

### III. SUMMARY OF THE EVIDENCE

Plaintiff was born on December 25, 1945 and was fifty-eight (58) years old at the time of the decision. (R. 429.) Plaintiff completed high school and some college and has past relevant work history as a security guard, boat repairer, flight engineer, police officer and electrician. (R. 430-432.) Plaintiff contends that he became disabled on March 4, 2000 due to "cervical radiculopathy, numbness in his right hand, asthma, hypertension, bilateral tinnitus, perforated tympanic membranes, degenerative disc disease, memory loss, triglycerides, 25% loss of kidney function, hernia, ventral and hiatal and hyperlipodema." (R. 25.)

Based upon the evidence submitted and the testimony presented at the hearing, the ALJ determined that Plaintiff suffers from Bipolar disorder, a history of panic attacks and degenerative disc disease. (R. 461.) The ALJ determined that Plaintiff retains the residual functional capacity (RFC) to perform a "full range of medium work" as defined

---

[20] Wolfe at 1077-78.

[21] See id.

[22] See Doughty at 1278 n.2.

by 20 CFR § 404.1567 and that the Plaintiff was not disabled based upon application of the Medical-Vocational Guidelines.

### *The Medical Evidence*

Because the primary issue in this case relates to Plaintiff's complaints of pain from degenerative disc disease, the Court will limit its discussion to the medical evidence relating to Plaintiff's degenerative disc disease.

Plaintiff was involved in a motor vehicle accident resulting in a major injury in 1985. (R. 292.) Due to other various occupational injuries, Plaintiff was placed on medical disability retirement from the United States Park Police in 1989. *Id*. Plaintiff was also injured in 1993 while moving a 300 pound airplane mechanic tool box. *Id*. While working at a boat company in 1997, a defective hydraulic cylinder struck Plaintiff injuring his back and neck. (R. 293.)

Chronologically, the medical records begin in November 12, 1986 with notes describing an anterior C5-6 discectomy[23] Plaintiff underwent for treatment of a C5-6 herniated nucleus pulposus with spontylotic radiculopathy.[24] (R. 204, 205.) Post operative notes disclose that Plaintiff experienced less pain but that Plaintiff did not seem to be doing as well as expected. (R. 203.)

Plaintiff was then treated at the Veteran's Administration (the "VA") Hospital at Bay Pines from January 19, 1996 through June 28, 2002. (R. 310-372.) Plaintiff complained of back pain during his 1996 visits to the VA. (R. 349-351, 356.) Treatment

---

[23] Excision, in part or whole, of an intervertebral disk. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

[24] Disorder of the spinal nerve roots. *Id*.

notes from Dr. John Runnels state that Plaintiff "uses a home cervical traction unit with 10-pounds of weight, also a cervical collar in the evenings p.r.n. with a good surgical result." (R. 349.)

During a March 21, 2001 visit, the VA noted that Plaintiff continued to take Oxycontin and Robaxin for his chronic back pain. (R. 346.) After reporting continued back and neck pain during a June 29, 2001 visit, the VA referred Plaintiff to the Neurology Department. (R. 336.) The VA prescribed Darvocet for Plaintiff's back and neck pain from January 3, 2002 through June 28, 2002. (R. 312, 324.) Treatment notes from June 28, 2002 disclose that Plaintiff's back pain was more or less controlled. (R. 312.)

Dr. Kenneth A. Berdick examined Plaintiff on January 23, 2001. (R. 216-218.) Dr. Berdick noted muscle spasm in Plaintiff's neck and back, and restriction of movement in the lumbar spine but "[a]ll other joints move in a full range of motion without pain on movement." (R. 217-18.) Dr. Berdick noted that activities involving lifting, bending and carrying would exacerbate Plaintiff's low back pain but a sedentary position appeared reasonably comfortable. (R. 218.)

Dr. Douglas Newland, a neurologist, treated Plaintiff from July 13, 2000 through June 9, 2004. (R. 282-309, 395-410.) During Plaintiff's first visit, Dr. Newland noted prominent neck stiffness with 50% loss of flexion and tiling and rotating and 75% loss of extension. (R. 294.) A spine examination revealed 25% loss of forward flexion and 25% loss of back extension. (R. 295.) Dr. Newland's impressions included cervical radiculopathy with right C5, C6 and C8 clinical symptoms, right lumbar and lower extremity pain suggesting right L4 radiculopathy, chronic pain syndrome, and medical

disability following multiple occupational injuries. (R. 295-296.) Dr. Newland prescribed OxyContin. (R. 296.)

Plaintiff returned to Dr. Newland following an MRI of the cervical spine revealing "mild degenerative disc bulging." (R. 307.) During his visit on August 16, 2000, Plaintiff continued to complain of consistent cervical, lumbar, right arm and leg pain. However, Plaintiff reported that his pain level reduced from 8-9 to 7-8. (R. 290.) Dr. Newland increased the dosage of OxyContin and recommended stretching and strengthening. (R. 291.)

On March 21, 2002, Plaintiff described severe neck pain causing insomnia and prompting an emergency room visit. (R. 287.) Plaintiff also told Dr. Newland that " the OxyContin allows him to be mobile and pain tolerant instead of immobilized." *Id.* Dr. Newland continued treatment of OxyContin with consistent exercise and mobility. (R. 288.) Dr. Newland referred Plaintiff to the Lee Pain Clinic for his back pain. *Id.* On an Office of Disability Determinations form from the same date, Dr. Newland wrote that "memory and psych problems not disabling. Chronic pain is the problem." (R. 285-286.) However, Dr. Newland described Plaintiff's strength as a graded 5/5 and that Plaintiff had normal coordination. (R. 286A.) Dr. Newland further stated that Plaintiff had "good muscle bulk (works out) [with] no obvious loss of power." *Id.*

Follow-up progress notes from Dr. Newland disclose that Plaintiff's disability remained unchanged. Dr Newland continued to prescribe OxyContin and encouraged continued exercise. (R. 397-406.) The most recent assessment from Dr. Newland on June 9, 2005 noted "partial improvement in left cervical and arm pain." Dr. Newland

recommended cervical epidural block at C6-7 and selective left C7 nerve root steroid local anesthetic block through the Lee Pain Clinic. (R. 397.)

On March 28, 2002, Dr. Ronald S. Kline, a medical consultant, filled out a Medical Summary Sheet regarding Plaintiff's impairments. (R. 267.) Dr. Kline stated that Plaintiff's chronic pain syndrome was not severe and did not affect function. *Id.* Although Plaintiff alleged multiple areas of pain, Dr. Kline's opinion took into consideration the fact that Plaintiff regularly lifted heavy weights at the gym, as well as the results of the general examination, which showed no evidence of impairment. *Id.*

State Agency Physician Dr. A.E. Archibald-Long completed a Physical Residual Capacity Assessment of Plaintiff on August 20, 2002. (R. 387-394.) The assessment provides that Plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk or sit for about 6 hours in an 8-hour workday. (R. 389.) Additionally, Dr. Archibald-Long noted that Plaintiff had no postural limitations and no manipulative limitations. *Id.* Dr. Archibald-Long also stated that Plaintiff's "chronic pain allegations are partially credible." (R. 392.)

***CDI Investigation***

On March 28, 2001, Plaintiff's wife contacted the Social Security Administration and advised that Plaintiff was "pretending to be more physically disabled than he really is." (R. 139.) Further, Plaintiff's wife advised that she had submitted under duress a form that falsely describes Plaintiff's functional limitations. Consequently, Plaintiff's wife retracted the allegations. (R. 141.) As a result of the allegations by the Plaintiff's wife, an investigation of Plaintiff was conducted by the Cooperative Disability Investigations Unit (CDI) of the Office of the Inspector General. (R. 135-147.) The investigation by the CDI

included surveillance of Plaintiff's activities. During the surveillance of Plaintiff by the CDI, the investigators observed Plaintiff driving, running errands, exercising at a health club and moving around without any apparent physical limitations. (R. 136, 142.) Statements from Plaintiff's neighbor also disclosed that Plaintiff continued to go fishing on his boat, that he maintains a social life, and that he lives alone and not with his wife, as initially represented in Plaintiff's disability filing.  (R. 136, 144.)

## IV. DISCUSSION

Plaintiff's only argument is that the ALJ violated the Eleventh Circuit pain standard in finding Plaintiff's complaints of pain not credible. Apparently recognizing that he would have no luck arguing that he was disabled at the same time he was observed by the OIG investigators engaging in a vigorous weight lifting regime at a health club, Plaintiff instead contends that the ALJ failed to give the proper weight to Plaintiff's claims of disabling pain during the closed period of March 1, 2000 through May 1, 2001. The Commissioner argues that "[I]n light of Plaintiff's history of giving fraudulent statements to support his disability claim, and suborning others to do the same, the ALJ's conclusion that Plaintiff's subjective complaints could not be taken at face value would seem to be beyond contest." Furthermore, the Commissioner points out that in addition to the ALJ's reliance upon the damaging results of the OIG investigation, the ALJ also discussed a host of medical evidence that established that despite Plaintiff's medical impairments he was doing fairly well.

The law concerning the analysis of subjective complaints of pain is well settled. In evaluating disability, the ALJ must consider all of a claimant's impairments, including his subjective symptoms, such as pain, and determine the extent to which the

symptoms can reasonably be accepted as consistent with the objective medical evidence.[25] The Eleventh Circuit has set forth a three-part test for determining when a disability may be established based on subjective complaints of pain.[26] The "pain standard" requires that the plaintiff first produce medical or other evidence of an underlying medical condition. Then the plaintiff must demonstrate either that objective medical evidence confirms the severity of the alleged pain arising from that condition or that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.[27] "Pain alone can be disabling, even when its existence is unsupported by objective evidence."[28] However, a claimant's subjective complaints of pain do not conclusively establish a disability unless accompanied by medical evidence.[29]

If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the

---

[25] 20 C.F.R. § 404.1528.

[26] Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986).

[27] Id.

[28] Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987).

[29] 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms *shall not alone be conclusive evidence of disability* as defined in this section; there *must* be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability") (emphasis added).

record must be obvious as to the credibility finding.[30] A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.[31]

In the instant case, the ALJ applied the Eleventh Circuit's pain standard "threshold"[32] assessment to Plaintiff's subjective complaints by noting that Plaintiff presented objective medical evidence of degenerative disc disease. (R. 461.) Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's complaints regarding his level of pain and inability to work were not wholly credible, stating that Plaintiff's allegations were "essentially the same as those he made at a time when he was clearly leading a far more active lifestyle, and was more capable mentally, than he admitted." (R. 462.)

In making this finding, the ALJ conducted a thorough examination of Plaintiff's medial history, including Plaintiff's complaints of pain. The ALJ noted and properly recognized that Plaintiff complained of chronic pain, give-way weakness of the left biceps and triceps, episodic right sciatic, degenerative arthritis, right arm pain and cervical pain. (R. 461.) Specifically, the ALJ stated that "claimant may have undergone worsening of his spinal condition since his alleged onset date." (R. 462.)

In accordance with the pain standard, the ALJ then went on and articulated a number of reasons based upon compelling and substantial evidence for discounting Plaintiff's complaints of pain. In this regard, the ALJ pointed to the neurological

---

[30] Foote, 67 F.3d at 1561-62; Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[31] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[32] Marbury, 957 F.2d at 839.

examination by Dr. Newland on July 13, 2000, which revealed that, "claimant worked out and had good muscle bulk with no obvious loss of power" and "normal coordination." (R. 460.) The ALJ also found as significant the fact that the MRI of Plaintiff's cervical spine on August 14, 2000 showed only "mild" post surgical scarring and mild degenerative joint disc disease. Furthermore, as the ALJ noted, the physical examination by Dr. Berdick on January 23, 2001 did not reveal any neurological deficits, and disclosed that Plaintiff had normal grip strength, finger dexterity and gait, and did not have any joint swelling, erythema or warmth and had normal muscle testing.

The ALJ also discounted Plaintiff's subjective complaints of pain[33] based upon Plaintiff's own inconsistent statements. For example, Plaintiff testified that the reason he stopped working was because his employer went out of business and not because of his inability to perform his job. (R. 462.) Moreover, the ALJ found highly significant the fact that "at a time when the claimant stated … that he could not stand on his feet long enough to prepare a meal, or manage his own grocery shopping, he was pursuing a physically vigorous regimen that many men younger than [Plaintiff] would have a hard time to keep up with. " *Id.* Indeed, the ALJ emphasized in his decision that the records from Plaintiff's health club evidence that "the claimant had visited it [the health club] 71 times during a period of 71/2 months."

The ALJ also pointed out that Plaintiff's neighbor had disclosed to the CDI investigator on May 31, 2001 that Plaintiff went fishing on a boat that Plaintiff kept in his

---

[33] In disability forms Plaintiff filed with SSA he claimed that he could not walk store aisles, push a cart, that he had no activities, and that he required assistance with household chores did almost nothing. (R. 93.)

13

backyard. This statement was in stark contrast to Plaintiff's own statement several months before, on December 18, 2000, that he could no longer fish.[34]

Lastly, in his analysis the ALJ properly noted that the Plaintiff's activities of daily living included preparing simple dinners, doing laundry, walking 3 blocks and lifting weights at a health club 3-4 times a week. (R. 461, 462.) While a claimant's activities of daily living are not conclusive evidence that a claimant was not disabled during the relevant period of time, the breadth and scope of the activities engaged in by Plaintiff are - at the very least - consistent with the functional ability of an individual who can perform medium level exertional work. Indeed, as the ALJ appropriately noted, the Plaintiff was observed performing a heavy weight lifting program at the health club he attended on a regular basis, which is an activity that is diametrically inconsistent with Plaintiff's claims that his pain was so severe that he could not even lift or carry pots and pans.

The Court, therefore, concludes that the ALJ properly applied the Eleventh Circuit pain standard in analyzing whether the Plaintiff's subjective complaints were credible. Where, as here, an ALJ has made a clearly articulated credibility finding based upon substantial supporting evidence in the record, a reviewing court should not disturb the findings by the ALJ. The reasons articulated by the ALJ for rejecting Plaintiff's testimony that his pain was disabling were based upon the medical evidence and other substantial evidence of record. Indeed, as the Commissioner suggests, based upon the

---

[34] Plaintiff argues that reliance on the CDI report by the ALJ was improper because the investigation was prompted by his wife's false allegations. However, the ALJ explicitly discredited the wife's statements that were later retracted. (R. 462.) The ALJ properly utilized the evidence in the CDI report that recounted the personal observations of the CDI investigator, who actually observed the Plaintiff engaged in vigorous work-outs at the health club and who interviewed the neighbors.

medical evidence and the other evidence of record, including the OIG report "the ALJ's conclusion that Plaintiff's subjective complaints could not be taken at face value would seem to be beyond contest." After reviewing the evidence of record in this case and the ALJ's decision the Court fully concurs with this assessment of the ALJ's decision in this case.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED.**

**IN CHAMBERS** at Ocala, Florida, on September 25, 2007.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:

    Honorable Wm. Terrell Hodges
    Senior United States District Judge

    All Counsel